CRUZ M. SILVA RODRÍGUEZ, demandante y recurrido, *v.* ADMINISTRACIÓN DE LOS SISTEMAS DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO Y LA JUDICATURA, demandada y peticionaria.

*Número:* CE-88-120 *Resuelto:* 17 de abril de 1991

Norma Cotti Cruz, *Subprocuradora General*, y *Nilda P. Fuentes Ortiz, Procuradora General Auxiliar*, abogadas de la peticionaria; *Elis Oscar Pomales Pomales*, abogado del recurrido.

EL JUEZ ASOCIADO SEÑOR ANDRÉU GARCÍA emitió la opinión del Tribunal.

■ Esta opinión nos permite interpretar los requisitos dispuestos en el Art. 2 de la Ley sobre Pensiones por Incapacidad o Muerte en el Cumplimiento del Deber, Ley Núm. 127 de 27 de junio de 1958, según enmendada, 25 L.P.R.A. sec. 377, para que un miembro de la Policía que se incapacita en el ejercicio de sus funciones oficiales pueda ser acreedor a la pensión especial dispuesta por dicho estatuto.[1]

Una relación de los hechos que motivaron esta opinión ayudará en la comprensión de la decisión que emitimos. Veamos.

## I

El recurrido Cruz M. Silva Rodríguez era un policía estatal adscrito al Cuartel de la Policía de Caguas. El 29 de julio de 1980, mientras llevaba a cabo un patrullaje preventivo en un vehículo oficial que conducía otro agente de la Policía, sufrió un accidente en el acto de dirigirse al lugar donde había ocurrido un robo. En una declaración jurada que prestó el 19 de agosto de 1980, el señor Silva Rodríguez describió el accidente de la manera siguiente:

Que el día 29 de julio de 1980, a eso de las 12:30 P.M. me encontraba prestando servicio junto al policía Wigberto Reyes Collazo 2950, en el Sector 718 y en el turno de 12:00 M a 8:00 P.M., y surgió una llamada de emergencia de que en la calle Gautier Benítez de Caguas *había ocurrido un asalto.*[2] Nos dirigíamos por la avenida Mercado de Caguas con la sirena puesta, al llegar a la intersección de la calle Georgetti con la luz verde a nuestro favor

---

[1] La mencionada ley concede, como veremos más adelante, una pensión equivalente a la totalidad del sueldo que devengaba el servidor público al momento de sobrevenir su incapacidad.

[2] El asalto tuvo lugar en una joyería. Según el Informe de Delito preparado por la Policía, dos (2) jóvenes entraron a dicho negocio y tras amenazar de muerte a varias personas cargaron con unos $20,000 en prendas. Al abandonar el lugar, hubo un intercambio de disparos entre el dueño de la joyería y los asaltantes. Como consecuencia de dicho intercambio, tres (3) transeúntes menores de edad resultaron heridos. Los dos (2) asaltantes fueron posteriormente identificados y se arrestó a uno de ellos. Éste resultó convicto de robo y de dos (2) infracciones a la Ley de Armas de Puerto Rico, 25 L.P.R.A. sec. 411 *et seq.* Aparentemente, el otro nunca fue arrestado.

fuimos impactados por el lado derecho por un auto particular que no se detuvo ante la luz roja. Sufriendo el auto oficial 8146-GE, marca Fairmont, modelo 1979, daños en lado derecho, luego del accidente fuí [sic] conducido por una ambulancia al hospital municipal, me atendieron en éste y posteriormente fuí [sic] referido al Fondo del Seguro del Estado. Quiero hacer constar que debido a este accidente no me encuentro bien de los nervios ya que he continuado padeciendo de los mismos. Que eso es todo. (Énfasis suplido.) Alegato, *Exhibit* V, pág. 21.

Como consecuencia de este accidente, el policía Silva Rodríguez recibió tratamiento en el Fondo del Seguro del Estado (en adelante el Fondo), del cual fue dado de alta el 24 de marzo de 1981, con una determinación de incapacidad resultante en pérdida de un 5% de sus funciones fisiológicas generales debido a una condición orgánica.[3] Posteriormente, en 1985, el Fondo, luego de diagnosticarle un desorden de ansiedad con somatizaciones, le concedió a Silva Rodríguez incapacidad adicional de un 10% como resultado de dicha condición emocional. Esta condición fue relacionada con el accidente que sufrió en 1980. El Fondo recomendó su retiro de la Policía de Puerto Rico.

Como resultado de dicha recomendación, mediante carta de 29 de octubre de 1985, la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura (la Administración) concedió al recurrido una pensión por incapacidad ocupacional al amparo de la Ley Núm. 447 de 15 de mayo de 1951, según enmendada.[4] No conforme con dicha determinación, éste apeló a la Junta de Síndicos de la Administración (Junta de Síndicos)

---

[3] La lesión sufrida se le diagnosticó como "residuos de trauma craneal, hombro derecho, pecho y ambas piernas, relacionado".

[4] 3 L.P.R.A. sec. 761 *et seq.* Esta ley, en su Art. 9, dispone:

"Todo participante que como resultado de una incapacidad que se origine por causa del empleo y surja en el curso del mismo, quedare incapacitado para el servicio, tendrá derecho a recibir una anualidad por incapacidad ocupacional, siempre que: (a) de uno o más médicos, según se dispone en la sec. 771 de este título, se recibiere prueba adecuada en cuanto a la incapacidad mental o física del participante; (b) el participante o el patrono, de acuerdo con los reglamentos de la Junta, notifique al Administrador con respecto a dicha incapacidad, y (c) la incapacidad fuere indemnizable de acuerdo con las disposiciones de la Ley de Compensaciones por Accidentes del Trabajo, Capítulo I del Título 11.

"El importe de la anualidad *será igual al cincuenta (50) por ciento* del tipo de retribución que se hubiere percibido en la fecha en que la misma sea efectiva." 3 L.P.R.A. sec. 769.

por entender que tenía derecho a la pensión provista por el Art. 2(1)(e) de la Ley Núm. 127, ante, 25 L.P.R.A. sec. 377(1)(e).

Luego de celebrarse la correspondiente vista, la Junta de Síndicos confirmó la decisión de la Administración al concluir que el apelante no tenía derecho a recibir pensión por incapacidad bajo las disposiciones de la Ley Núm. 127, ante.

De dicha determinación de la Junta de Síndicos, Silva Rodríguez recurrió en revisión al Tribunal Superior de Puerto Rico, Sala de Caguas.

Luego de los trámites de rigor, el tribunal de instancia(5) revocó la resolución recurrida y ordenó que se extendieran al recurrido los beneficios provistos por la Ley Núm. 127, ante. El tribunal concluyó que los hechos probados están enmarcados dentro de las situaciones descritas en el citado Art. 2 de la referida ley.

Ahora recurre ante nos la Administración para que revoquemos la mencionada determinación. Luego de recibir los escritos de ambas partes y de conocer sus posiciones, estamos en situación de resolver.

## II

*El alcance del Art. 2 de la Ley Núm. 127*

El recurrido Silva Rodríguez entiende, y así creyó el tribunal de instancia, que el accidente ocurrido el 29 de julio de 1980 está comprendido dentro de las situaciones descritas por tal artículo. No tiene razón. Veamos.

Al examinar los alcances de la anterior Ley Núm. 189 de 2 de mayo de 1951 (25 L.P.R.A. ants. secs. 361–374) —cuyo estatuto es el originador de la pensión que ahora es objeto de análisis— en *López v. Muñoz, Gobernador*, 81 D.P.R. 337, 340–341 (1959), recogimos el historial de dicho estatuto del modo siguiente:

·En la Sesión Ordinaria de la Asamblea Legislativa de 1951 se consideró y aprobó un sistema general de pensiones para los

---

(5) Hon. Enrique Jordán Musa, Juez.

empleados públicos, la Policía de Puerto Rico inclusive, bajo las disposiciones de la Ley 447 de 15 de mayo de ese año, —3 L.P.R.A. [sec.] 761. En los arts. 9 y 12 de esta ley —3 L.P.R.A. secs. 769, 772,—tal como fueron originalmente aprobados, se concedió a un miembro del Cuerpo de la Policía el derecho a recibir una pensión equivalente al 50% de su sueldo, o a su viuda e hijos en caso de muerte hasta un 60%, si como resultado de una incapacidad física *originada por causa del empleo y surgida en el curso del mismo* quedare incapacitado para el servicio, o falleciere, siempre que dicha incapacidad fuera indemnizable de acuerdo con la Ley de Compensaciones por Accidentes del Trabajo; y con sujeción, además, a otras restricciones y limitaciones. En la misma Sesión la Asamblea Legislativa consideró y aprobó la Ley 189 de 2 de mayo de 1951—25 L.P.R.A. sec. 361—concediendo una pensión anual equivalente al sueldo completo a todo miembro del Cuerpo de la Policía Insular, de la Guardia Nacional, del Cuerpo de Bomberos y de la Guardia de Penales, que resultare incapacitado para continuar en el servicio, y a los beneficiarios de éstos, en caso de fallecimiento, cuando tal incapacidad o fallecimiento ocurriere bajo las circunstancias relacionadas en el *artículo 1* de dicha ley. Precedido de una exposición del legislador expresando el propósito con el cual aprobaba la Ley 189: "de proveer lo necesario para mitigar la situación de desamparo y penuria que la incapacidad para el trabajo físico o la muerte de miembros de la Policía Insular, de la Guardia Nacional, del Cuerpo de Bomberos del Servicio Insular de Bomberos y de la Guardia de Penales, dejan entre éstos o sus familiares cuando tal incapacidad o muerte sobreviene *mientras estos servidores de la seguridad pública se dedican a la defensa del respeto que se debe a la libertad de todos y a la paz con que el pueblo de Puerto Rico quiere desarrollar sus instituciones*"; y también que "[L]a Asamblea Legislativa entiende que todo servidor de la seguridad pública—sea policía, guardia nacional, bombero o guardia penal—debe tener asegurado por ley un trato igual para los suyos si pierde la vida *protegiendo la de los demás* en el desempeño honroso de su deber", (énfasis ofrecido) el *artículo 1* estatuyó que las disposiciones de dicha Ley 189 serían aplicables a casos de incapacidad para el trabajo físico o muerte "*sobrevenida bajo las siguientes circunstancias*:

"(a) En caso de un miembro de la Policía Insular, al evitar o al tratar de evitar la comisión de un delito, o al apresar o tratar de apresar a alguien que se pueda presumir razonablemente que está

conectado con la comisión de un delito". (Énfasis en el original y escolio omitido.)

En el curso de resolver la controversia que estaba presente en dicho caso, expresamos lo siguiente:

No obstante, los recurrentes invocan la "intención legislativa" para sostener su interpretación de que ". . . en cuanto a los policías se refiere, los riesgos que cubre la ley *son aquellos daños causados como resultado directo, violento y extraordinario del acto de apresar a un delincuente o tratar de evitar la comisión de un delito.*" Infieren que ése fue el propósito del legislador aduciendo dos argumentos: (1) *que en el caso de los bomberos específicamente se cubrió el riesgo común de un accidente de automóvil al dirigirse a un sitio para la extinción de un incendio,* y (2) que la ley se aprobó a raíz de la revuelta nacionalista en que los policías tuvieron que afrontar riesgos extraordinarios. Lo curioso es que ambos argumentos corroboran superlativamente nuestra interpretación de la ley.

La premisa implícita del primer argumento es el aforismo jurídico de que si la ley se refiere a un caso dado, se entienden excluídos los demás (*inclusio unius est exclusio alterius*). Pero esta máxima de interpretación restrictiva no es aplicable por la sencilla razón de que en el sentido de la ley no admite excepciones en el caso de los policías. En efecto, con términos generales y terminantes el legislador cubrió *todos* los casos en que la incapacidad o muerte de un policía ocurra al apresar o tratar de apresar a un presunto delincuente. Y sobre todo importa subrayar que la finalidad de la ley era ". . . proveer lo necesario para mitigar la situación de desamparo y penuria . . . . cuando [la] incapacidad o muerte sobrevienen mientras estos servidores de la seguridad pública se dedican a la defensa del respeto que se debe a la libertad de todos y a la paz con que el pueblo de Puerto Rico quiere desarrollar sus instituciones . . ." De ahí que obviamente la disposición relativa a los bomberos no sea de índole excepcional. Si consideramos las razones que el legislador tuvo para cubrir el riesgo que corren los bomberos al dirigirse a un sitio para la extinción de un incendio, es forzoso concluir que tampoco quiso excluir el riesgo de caerse e incapacitarse que corren los policías al perseguir y tratar de apresar a cualquier delincuente. Donde la razón es la misma, idéntica debe ser la norma de derecho. (Énfasis suplido.) *López v. Muñoz, Gobernador,* ante, págs. 345–346.

Probablemente por razón de que la Asamblea Legislativa no estuvo conforme con los efectos del mencionado estatuto, el mismo quedó derogado por la Ley Núm. 127, ante. En lugar de lo señalado anteriormente y dispuesto en el apartado (a) del Art. 1 del estatuto derogado, se adoptaron las siguientes disposiciones que se recogen en el inciso (1) del Art. 2 del nuevo estatuto, 25 L.P.R.A. sec. 377(1):

*Sec. 377. Aplicación de las secs. 376 a 387*

Las disposiciones de las secs. 376 a 387 de este título y el reglamento que se apruebe para su administración serán aplicables a cualquier persona que como miembro de la Policía, del Cuerpo de Bomberos, de la Guardia de Penales, de la Guardia Nacional o como Agente de Rentas Internas, Superintendente de Instituciones Penales del Departamento de Justicia, el Administrador General o Subadministrador General de la Corporación Industrias de Prisiones de Puerto Rico y Subdirectores de Corrección y en el desempeño de sus funciones se incapacite física o mentalmente para el servicio o muera bajo alguna de las siguientes circunstancias:

1. En caso de un miembro de la Policía:

(a) al ser atacado al evitar o tratar de evitar la comisión de un delito;

(b) al ser atacado al apresar o tratar de apresar a alguien que se pueda presumir razonablemente que está conectado con la comisión de un delito, al realizar registros e incursiones o durante los interrogatorios siguientes a tales registros e incursiones, o en el acto de la confiscación de armas o de cualquier artículo, independientemente de su naturaleza, que estén en posesión de personas en violación de cualquier estatuto;

(c) al ser atacado al poner fin o tratar de poner fin a cualquier desorden, motín o cualquier acción contraria al orden, a la seguridad pública, o a la autoridad debidamente constituida;

(d) *al dirigirse a*, o mientras presta servicios en la extinción de un incendio;

(e) al intervenir en el salvamento de la vida de un semejante o para proteger propiedades que por cualquier circunstancia corrieren peligro, *para lo cual tuviere que arriesgar la suya propia*; o

(f) al ser atacado al intervenir con cualquier demente con el fin de recluirlo en una institución, o someterlo a proceso judicial o a tratamiento. (Énfasis suplido).

De una simple lectura de estas nuevas disposiciones nos damos cuenta de que, a través de las mismas, la Asamblea Legislativa adoptó el criterio que rechazamos en *López v. Muñoz, Gobernador*, ante. Así surge expresamente del informe de la Comisión de Elecciones y Personal del Senado al someter el P. del S. 374 —que luego se convertiría en la Ley Núm. 127, ante— el cual, en su parte pertinente, contenía lo siguiente:

El proyecto que ahora informamos procura remediar las fallas que presenta la ley actual. Sus disposiciones proveen lo siguiente:

(1) Se aplica a los mismos grupos cubiertos por la ley actual: policías, bomberos, guardias de penales, guardias nacionales y agentes de rentas internas.

. . . . . . . .

(4) Se definen *claramente* las circunstancias en que aplicaría la protección especial que se provee y se introduce en *todos* los casos, *excepto* en el de los bomberos y policías en la tarea de extinguir incendiós y en el de estos últimos al intervenir en el salvamento de la vida de un semejante o para proteger propiedades que por cual[es]quier[a] circunstancias corrieren peligro *para la cual tuviere que arriesgar la suya propia*, el requisito de agresión física al empleado para que pueda ser de aplicación al estatuto. (Énfasis suplido.) 10 Diario de Sesiones de la Asamblea Legislativa (Ordinaria) T. III, pág. 1264 (1958).

Vemos, pues, que la Ley Núm. 127, ante, tuvo el propósito de requerir *que el policía hubiera sido atacado* para ·poder beneficiarse de la pensión especial que esta ley provee, *excepto* en las dos (2) circunstancias siguientes: (1) *al dirigirse a*, o mientras presta servicios en *la extinción de un incendio*, y (2) al intervenir en el salvamento de la vida de un semejante o para proteger· propiedades que por cualquier circunstancia corran peligro, *para lo cual tengan que arriesgar su propia vida.*

Somos conscientes de que las disposiciones de un estatuto reparador, como es la Ley Núm. 127, ante, deben ser interpretadas liberalmente en favor de los beneficiarios de las mismas. Sin embargo, mediante esta ley el legislador se propuso *"defin[ir] claramente las circunstancias en que aplicaría la*

*protección especial que se provee"* por dicho estatuto,(6) *por lo que se impone una interpretación restrictiva respecto a la enumeración que de las mismas se hace en el Art. 2,* ante, *que hemos transcrito.* Así, en *González v. Adm. de Sistemas de Retiro,* 113 D.P.R. 292, 294 (1982), señalamos que la Ley Núm. 127, ante, no cubre todos los accidentes o daños que pueden sobrevenir a un policía en el desempeño de sus funciones, ya que tienen que estar presentes aquellas circunstancias *especiales* que fija el estatuto al *enumerar taxativamente* las circunstancias que pueden hacer a un servidor público acreedor a una pensión especial.

Dicho artículo señala un gran número de actuaciones específicas llevadas a cabo por un policía como parte de sus funciones: evitar o tratar de evitar la comisión de un delito; arrestar o tratar de arrestar a quien ha cometido un delito; llevar a cabo registros, allanamientos e interrogatorios resultantes de tales registros o allanamientos; realizar confiscaciones de armas o artículos delictivos; poner fin o tratar de poner fin a cualquier desorden, motín o cualquier acción contraria al orden, a la seguridad pública o a la autoridad debidamente constituida; prestar servicios en la *extinción de un incendio;* intervenir en el salvamento de la vida de un semejante *o para proteger propiedades en peligro* y, finalmente, intervenir con cualquier demente con el fin de recluirlo en una institución o someterlo a un proceso judicial o un tratamiento.

No obstante esta extensa y detallada enumeración, el legislador *no incluyó el acto previo de trasladarse o dirigirse* al lugar donde ha de llevarse a cabo cualquiera de las antes enumeradas actuaciones, *exceptuando expresamente* el acto de dirigirse a prestar servicios en la *extinción de un incendio.*

La derogada Ley Núm. 189, ante, no extendía a los policías el derecho a gozar de los beneficios dispuestos por dicha pieza

---

(6) Véase el Informe de la Comisión de Elecciones y Personal del Senado sobre el P. del S. 374 (10 Diario de Sesiones de la Asamblea Legislativa (Ordinaria), T. III, pág. 1264 (1958)).

legislativa cuando la muerte o incapacidad sobrevenía en las circunstancias previstas por esta excepción, a pesar de que los bomberos sí disfrutaban de tal derecho. Por lo tanto, es evidente que la intención del legislador al adoptar dicha excepción como parte del nuevo estatuto fue equiparar a los policías con los bomberos en cuanto a este particular se refiere. Si el legislador hubiera tenido la intención de extender el beneficio de la pensión especial provista por esta legislación al acto previo de dirigirse al lugar en que debe realizarse cualquiera de las actividades enumeradas en el transcrito Art. 2, así éste lo habría dispuesto *expresamente*, de la misma forma en que lo hizo al referirse al acto previo de dirigirse a prestar servicios en la extinción de un incendio. Debemos tener presente que, como ya hemos señalado, el legislador se propuso "definir *claramente*" las circunstancias a las cuales se aplica la pensión especial provista por el mencionado estatuto.

 Tanto esta situación relativa a la prestación de servicios en la extinción de un incendio como aquellas otras en que el policía *tiene que arriesgar su vida* al intervenir en el salvamento de la vida de un semejante o para proteger propiedades en peligro constituyen, como hemos señalado, las *únicas* desviaciones del principal criterio que informó la intención legislativa al adoptar las disposiciones contenidas en el inciso (1) del Art. 2 de la Ley Núm. 127, *supra*. Salvo estas dos (2) circunstancias, el propósito cardinal del mencionado artículo fue cubrir aquellos daños sufridos por un policía *como resultado de un ataque físico en el desempeño de aquellas actuaciones oficiales taxativamente enumeradas en dicho estatuto*. El examen de tales disposiciones a la luz del historial legislativo que hemos reseñado no arroja discrepancia alguna entre el texto de la ley y los motivos o finalidades que persigue el estatuto. Por ser tales disposiciones claras y libres de toda ambigüedad, las mismas son la excepción por excelencia de la intención legislativa en este caso, lo cual nos obliga a rechazar la interpretación que hiciera de dichas disposiciones el tribunal de instancia.

III

*Aplicación del Art. 2 de la Ley Núm. 127 a los hechos de este caso*

Al revocar la resolución de la Junta de Síndicos, el tribunal de instancia determinó que al ocurrir el accidente el recurrido "se dirigía a perseguir a unas personas con el propósito de proteger *propiedades y vidas*". *Exhibit* I, págs. 3–4. Concluyó que "[c]uando nuestro legislador aprobó la Ley Núm. 127, sabía que no era lo mismo o no constituía el mismo riesgo, el que un policía dirigiera el tráfico o trabajara de retén en el cuartel de la policía y sufriera un accidente, como de aquel policía que sale en emergencia a exponer su vida para salvar la de otro y salvar su propiedad". Íd., pág. 4. "¿Qué más exposición al peligro está expuesto (sic), éste servidor público" —se preguntó en forma retórica dicho tribunal— "que tiene que salir de urgencia para la protección del ciudadano, conociendo (sic) ellos *el riesgo y el peligro que existe en nuestras carreteras*?". (Énfasis suplido.) Íd.

Si bien es cierto que un conductor que transita por nuestras carreteras —al igual que por las de cualquier otro país— está expuesto a sufrir un accidente que le puede costar la vida, el párrafo (e) del inciso (1) del mencionado artículo requiere que el policía *tenga* que arriesgar su vida al intervenir en el salvamento de la de un semejante o en la protección de propiedades en peligro. Esto es, no basta que el policía se exponga a un posible peligro como aquel al cual se expone de ordinario un conductor en nuestras carreteras. El vocablo *"tenga"*, en el contexto en que es utilizado por el legislador en el mencionado artículo, implica la *necesidad* de exponerse a un riesgo inmediato, de carácter inminente, cuya consecuencia probable sea la muerte o grave daño corporal.

La evidencia que tuvo ante sí el tribunal de instancia demuestra que el accidente en que se vio involucrado el recurrido ocurrió exclusivamente como consecuencia de la negligencia del conductor del otro vehículo que chocó con el auto en que viajaba dicho policía. Tal evidencia no demuestra que el auto patrulla viajara a

gran velocidad o que el conductor del mismo haya tomado alguna clase de riesgo en la conducción de su vehículo.

No toda gestión policíaca que conlleve cierto riesgo o cierto grado de dramatismo pone en peligro la vida del agente. Extender el beneficio de la Ley Núm. 127, ante, a situaciones como la de autos equivaldría a ampliar excesivamente el beneficio de la ley, desvirtuando así el propósito del estatuto.

Bajo las circunstancias presentes en este caso no podemos concluir que el recurrido arriesgó su vida para salvar la de otra persona o a alguna propiedad en peligro. La liberalidad que debe prevalecer al aplicar las disposiciones de un estatuto reparador como lo es la Ley Núm 127, ante, no puede justificar el que se extienda el ámbito del mismo más allá de la intención del legislador. Un policía lesionado en el desempeño de sus funciones no es acreedor a una pensión bajo esta ley a menos que las circunstancias del accidente estén incluidas taxativamente en el estatuto. *González v. Adm. de Sistemas de Retiro*, ante, pág. 294.

Cuando la ley es clara y libre de toda ambigüedad, su letra no debe ser menospreciada bajo el pretexto de cumplir su espíritu. Art. 14 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 14. Cuando el legislador se ha manifestado en lenguaje claro e inequívoco, el texto de la ley es la expresión por excelencia de toda intención legislativa. *Atiles, Admor. v. Comisión Industrial*, 77 D.P.R. 16, 20 (1954). Si el lenguaje de un estatuto es tan inequívoco que postula un solo significado, un sentido cabal de humildad y autodisciplina judicial requiere la aplicación de la voluntad legislativa. *Clínica Juliá v. Sec. de Hacienda*, 76 D.P.R. 509, 520 (1954).

Por todo lo cual, *procede la revocación de la sentencia emitida por el Tribunal Superior, Sala de Caguas. Se confirma, a su vez, la resolución emitida por la Junta de Síndicos de los Sistemas de Retiro de Empleados del Gobierno y la Judicatura mediante la cual se le niega al señor Silva Rodríguez la pensión especial al*

*amparo de la Ley Núm. 127 de 27 de junio de 1958, según enmendada.*(7)

El Juez Asociado Señor Negrón García disiente mediante opinión escrita.

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

I

Para el jurisprudente, en "este mundo existencial de hoy, en lo que interesa, es, precisamente, 'el hombre en su realidad concreta', —no el hombre abstracto, vaciado sobre un mismo molde, idéntico siempre a sí mismo, al ser gris, irreal . . .". (Escolio omitido.)(1) No podemos, pues, compartir la *visión restrictiva* que sirve de ancla a la opinión del Tribunal y cuyo resultado es negarle al policía Cruz M. Silva Rodríguez los beneficios de la pensión especial visualizados en la Ley Núm. 127 de 27 de junio ·de 1958, según enmendada, 25 L.P.R.A. sec. 376 *et seq.*

Silva Rodríguez es acreedor a la misma. La grave incapacidad física que ahora sufre es consecuencia directa de la gestión de *emergencia* que emprendió en ocasión de "intervenir en el salvamento de la vida de un semejante *o para proteger propiedades que por cualquier circunstancia corrieren peligro, para lo cual tuviere que arriesgar la suya propia . . .*". (Énfasis suplido.) 25 L.P.R.A sec. 377(1)(e).

Y es que la prueba refleja que lo que era un simple patrullaje preventivo rutinario se convirtió el 29 de julio de 1980 en una emergencia producto de un robo en una joyería de Caguas.

---

(7) Reiteradamente hemos sostenido que las conclusiones e interpretaciones de los organismos administrativos especiales merecen gran consideración y respeto. Este Tribunal respetará tales determinaciones si estas están sostenidas por evidencia sustancial. *Chase Manhattan v. Emmanuelli Bauzá*, 111 D.P.R. 708, 712 (1981); *Sucn. A. Bernat v. Peñagarícano, Admor.*, 84 D.P.R. 526, 531–533 (1962); *Reyes v. Junta de Planificación*, 79 D.P.R. 620 (1956).

(1) A. Reyes Terra, *El principio de la buena fe en la práctica judicial civil*, Montevideo, Fund. de Cultura Univ., 1969, pág. 6.

Aunque el accidente ocurrió en la intersección formada por la Calle Georgetti y la Ave. Mercado, no cabe duda alguna de que ese suceso estuvo estrechamente relacionado con el violento robo, *que generó un tiroteo y causó heridas a tres (3) personas.*

El cuadro expuesto y la fluidez situacional presentada derrotan la conclusión mayoritaria de que Silva Rodríguez no se dirigía a proteger propiedades y vidas. Aunque no se expone expresamente, la premisa que usan es que el referido robo había sido consumado. Ese razonamiento implica que, a menos que un policía esté de manera inmediata frente a un criminal o asaltante mientras delinque, no está cubierto por este estatuto remedial. No podemos aprisionar así los valores de vanguardia social que inspiraron al legislador.

Si bien coincidimos con el aserto mayoritario de que el riesgo natural de transitar por las carreteras del país no es suficiente para automáticamente activar esta ley (opinión mayoritaria, págs. 268–269), no cabe duda de que la misma favorece a los policías si se demuestra que existió una verdadera y legítima emergencia[2] y la lesión es el resultado de una intervención en el salvamento o protección de las vidas o propiedades. En este sentido, *poco importa que el accidente haya sido debido a la negligencia de una tercera persona.* Sencillamente, esta legislación no considera ese criterio, como tampoco episodios fraccionados en las situaciones de emergencia en que el agente arriesga su vida para proteger la de sus semejantes o propiedades.

No es determinante, como argumenta el Procurador General, que Silva Rodríguez no llegara al lugar de los hechos. Aunque no arribó allí a tiempo —debido, claro está, al accidente— expuso su vida y resultó gravemente lesionado. ¿No es ésta una de las situaciones atendidas en el estatuto?

La mayoría afirma que "[t]al evidencia no demuestra que el auto patrulla viajara a gran velocidad o que el conductor del

---

[2] La Ley de Vehículos y Tránsito de Puerto Rico, Ley Núm. 141 de 20 de julio de 1960, según enmendada, 9 L.P.R.A. sec. 301 *et seq., incluye* los vehículos de la policía en la categoría de "vehículos de emergencia" y los exime de varias reglas. Véanse: Secs. 5–503 y 5-1101 de la Ley Núm. 141, *supra,* 9 L.P.R.A. secs. 952 y 1131.

mismo haya tomado alguna clase de riesgo en la conducción de su vehículo". Opinión mayoritaria, pág. 269. Este aserto es incomprensible. La prueba es clara: respondían y atendían una "emergencia", y viajaban con la "sirena puesta". Ante esa prueba, la inferencia judicial debería ser totalmente contraria, esto es, lo razonable y probable es que viajaban a una velocidad mayor para atender *lo más pronto posible* la emergencia. Más aún, subsiste la siguiente interrogante: ¿qué velocidad sería suficiente para tipificar una exposición a riesgos de grave daño corporal? El riesgo de la Policía en este tipo de situación no se evalúa en millas por hora (M.P.H.). *Francamente, bajo el prisma mayoritario, la única conclusión que cabe es que el policía Silva Rodríguez meramente paseaba en el auto patrulla.*

II

En *López v. Muñoz, Gobernador*, 81 D.P.R. 337, 345 (1959), reconocimos que la finalidad de esta ley era *"proveer lo necesario para mitigar la situación de desamparo y penuria . . . cuando* [*la*] *incapacidad o muerte sobrevienen mientras estos servidores de la seguridad pública se dedican a la defensa del respeto que se debe a la libertad de todos y a la paz con que el pueblo de Puerto Rico quiere desarrollar sus instituciones . . .".* (Énfasis suplido.)

Impregnados de ese espíritu remedial, consideramos que las graves lesiones recibidas al ocurrir el accidente vehicular cuando se dirigía a atender la llamada de emergencia del asalto que se realizaba —con la necesidad de trasladarse, usando la sirena, a la mayor rapidez posible— configuró una circunstancia extraordinaria que puso a riesgo la vida propia del policía Silva Rodríguez. Bajo la lógica mayoritaria, si como consecuencia de la colisión hubiese *muerto*, ¿cabría todavía sostener que *no intervino* "para proteger propiedades", *arriesgando la suya*?

La decisión mayoritaria se aparta dolorosamente de toda la doctrina judicial de interpretar liberalmente estatutos de naturaleza reparadora. R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1987, pág. 455.

Vale recordar aquí, el "[f]laco servicio [que] hacemos a la justicia y muy mal retribuimos un servicio tan riesgoso —como el del policía— cuando desatendemos un reclamo tan justificado. Un trabajador, padre de familia, impulsado exclusivamente por el deseo de cumplir con su deber, expone y sufre una merma en su patrimonio y se desoye su justa solicitud . . . . Nuestra sociedad, asediada y deteriorada por la criminalidad, clama como un acto de justicia ese resarcimiento". *Ortiz Andújar v. E.L.A.*, 122 D.P.R. 817, 832 (1988).

En *González v. Adm. de Sistemas de Retiro*, 113 D.P.R. 292, 294 (1982), sin ambages sentenciamos que "[n]o es la letra de la ley, sino su espíritu, lo determinante de su significado". HOY ESTE TRIBUNAL NO HACE JUSTICIA; SENCILLA-MENTE APLICA EL TEXTO DE LA LEY, PERO MATA SU ESPÍRITU.